**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **FLEXIDER USA CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00764** |
| | ) | **Judge Aleta A. Trauger** |
| **CINDY RICHMOND d/b/a REDS** | ) | |
| **TRUCKING; AIRFREIGHT.COM, a** | ) | |
| **Delaware Corporation; and TOTAL** | ) | |
| **QUALITY LOGISTICS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court are two motions, both styled as a Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment Limiting Liability, filed by defendants Airfreight.com ("Airfreight") (Doc. No. 92) and Total Quality Logistics, LLC ("TQL") (Doc. No. 99). Airfreight also requests oral argument.

The court finds that oral argument would not assist it in resolving the issues raised by the motions. Airfreight's request for oral argument will be denied. Further, for the reasons set forth herein, both motions will be granted in part and denied in part.

## I.      STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Notably, this standard gives rise to the possibility that, when two defendants bring separate motions for summary judgment, the facts may be viewed differently depending upon which defendant's motion is being considered. *See Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (noting, in the context of cross-motions for summary judgment, that courts must "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non-moving party"). Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II. FACTS

The facts concerning the underlying incident are basically undisputed. To summarize briefly: The plaintiff, Flexider USA Corporation ("Flexider"), contracted with Airfreight, a transportation broker, to arrange the interstate transportation of several large and expensive pieces of manufacturing equipment—specifically, metal expansion joints (the "equipment" or "cargo")—from the plaintiff's facility in Oak Ridge, Tennessee to the location of Flexider's customer, AmSty, in St. James, Louisiana. Airfreight, in turn, worked with another broker, defendant TQL, to arrange the transport, and TQL contracted with several shippers, including defendant Cindy Richmond d/b/a Reds Trucking ("Reds Trucking"), who agreed to convey the equipment from Tennessee to Louisiana. Most of the equipment made it safely and on time to the intended destination. However, one piece of the equipment (the "Freight"), while being transported by Reds Trucking, became lodged on railroad tracks and was struck by a train. The Freight was destroyed.

There is no dispute that part of the agreement between Flexider and Airfreight required Airfreight to adequately insure the Freight (or to ensure that the Freight was adequately insured), that Airfreight in turn required TQL to adequately insure the Freight, and that Reds Trucking's insurance is insufficient to cover the value of the Freight. Although both Airfreight and TQL now appear to claim that they complied with their obligation to insure the Freight, both deny liability, and neither has stepped up to cover the loss incurred by the plaintiff. They also both argue that, even if they are required to cover the damage to the Freight, their liability should be limited to the actual value of the Freight. The plaintiff maintains that the defendants, collectively, are liable for the full measure of its damages, plus attorney's fees.

### A.   Facts Relevant to Airfreight's Motion[1]

Airfreight is a freight broker licensed by the Federal Motor Carrier Safety Administration. As a broker, Airfreight arranges for the transportation of its customers' cargo, but it does not actually transport the cargo itself, nor does it own or operate equipment that transports cargo.

In August 2017, Flexider employee Carol Cameron first contacted Airfreight about the shipment of the equipment from Oak Ridge, Tennessee to St. James, Louisiana. At that time, Airfreight employee Bryan Bereziuk quoted Flexider an approximate price of $25,000 for arranging for the shipment of the equipment but noted that Airfreight "would need time to find the right equipment and would need to know specific value of the freight." (Bereziuk Dep. 84, Doc. No. 94-3, at 11; Doc. No. 94-4.) On October 20, 2017, Cameron emailed Bereziuk to ask the cost of insurance coverage in the amount of $1.3 million for shipping all of the equipment. (Doc. No. 94-5.) On October 25, 2017, Bereziuk responded that he was "running into an issue with that much insurance." (Doc. No. 94-6.) He told Cameron that the carrier he wanted to use "only covers $500K unless we waive liability" but that he was "[s]till working on this." (*Id.*) Cameron indicated that, if the pieces of equipment were shipped individually rather than as one shipment, it might not be a problem. (Doc. No. 94-7, at 1.) She identified the values of the individual pieces of equipment as $447,577, $240,832, and $502,329[2] and suggested, "So maybe we just break it down per item as they will have to go on separate trucks anyway?" (Doc. No. 94-7, at 1–2.) The record does not indicate that Bereziuk confirmed whether this arrangement would be possible.

---

[1] If no citation to the record is provided, the particular fact is undisputed and drawn from the defendants' Statements of Undisputed Material Facts and the plaintiff's Responses thereto. (Doc. Nos. 94, 104, 101, 107.).

[2] The values referenced by Cameron were drawn from the purchase price of the equipment as reflected on the purchase order issued to Flexider by non-party Technip FMC ("Technip"), on behalf of Flexider's customer, AmSty. (Doc. No. 94-12.)

On November 13, 2017, Bereziuk notified Cameron via email that "[w]e"—presumably meaning Airfreight—would be working with "Mark from TQL" on the project. (Doc. No. 94-9.) The email was copied to Mark Prosise and included Prosise's contact information, identifying him as Logistics Account Executive for TQL. (*Id.*) Prosise was Airfreight's contact at TQL for purposes of shipping Flexider's equipment. Cameron responded, "Thank you Bryan." (*Id.*) Flexider, however, denies that Cameron's acknowledgment of TQL's involvement constituted consent for Airfreight to delegate any of its duties or waive any of its contractual obligations to Flexider. (Blignault Aff. ¶ 3, Doc. No. 105-2.) TQL is also a broker, not a carrier.

In his deposition, Bereziuk was asked about his understanding of Airfreight's agreement with TQL: "under your agreement, Airfreight's agreement with TQL, what is your understanding of what TQL was supposed to do? What were their obligations? What were they supposed to perform?" (Bereziuk Dep. 71, Doc. No. 105-8, at 20.) He responded: "Consult me so I can consult the customer, provide the trucks, provide the insurance, provide all of the follow-up tracking, and execute on the performance so that I can go back to my customer and facilitate communication." (*Id.*) Bereziuk also explained that Airfreight "didn't do a lot of oversized, over-dimensional" shipments. (*Id.* at 42, Doc. No. 105-8, at 13.) He went to TQL because it "had the capabilities to do it. They had oversized over-dimensional people that were knowledgeable about the shipment, and . . . they could provide the trucks needed for the job." (*Id.*) According to Bereziuk, Airfreight and TQL "came to the agreement that we could both do it." (*Id.*)

Prosise's testimony was largely consistent with Bereziuk's. (*See* Prosise Dep. 20, Doc. No. 105-12, at 7 (testifying that TQL could handle the "full truckload spectrum," including "specialized heavy haul"); *id.* at 48, Doc. No. 105-12, at 14 (identifying the services that Airfreight

was paying TQL for as "To find a truck, put a truck on the load, and to get it to the consignee," and confirming that the "load" to which he referred was "Flexider's load").)

Prosise also testified that his understanding with Airfreight was that "TQL had agreed . . . to provide . . . additional insurance to cover the value" of the Flexider shipment. (Prosise Dep. 79–80, Doc. No. 94-10, at 11.) According to Prosise, TQL obtained the additional insurance—also called "spike insurance" or "high-value cargo insurance." (*Id.* at 80, 82, Doc. No. 94-10, at 11, 12.) He explained the process for making sure additional insurance coverage applied to a particular shipment: "The only thing we have to do is in the load information table . . . you put in the value. And, for instance, this value would have been 250 to 500,000. As soon as I clicked that, it automatically populates the extra insurance." (*Id.* at 80, Doc. No. 94-10, at 11.) He confirmed that he did that for the Flexider shipments (*id.*), which resulted in a flat additional charge to "the customer"—*i.e.*, Airfreight—of $55 for coverage in that range (*id.* at 83, Doc. No. 94-10, at 12).

On October 18, 2017, Technip, on behalf of AmSty, issued the purchase order to Flexider to manufacture the equipment, with a total purchase price of $1,217,738, including $27,000 for the cost of shipping. (Doc. No. 94-12.) Nine months later, on July 20, 2018, a different Flexider employee, Jean Polk, contacted Bryan Bereziuk at Airfreight to obtain an updated proposal for the shipment.[3] Polk's email to Bereziuk noted that Flexider had been awarded the bid, and the customer had requested that Flexider provide "a transportation plan and route survey" based on additional information that had not been available in November 2017. (*See* Doc. No. 94-17, at 17.) By that point, Polk understood that there would be at least three separate shipments, beginning in August 2018. (*Id.*) After an exchange of additional emails and telephone calls, Bereziuk confirmed on August 2, 2018 that the bid price for shipping was the same, unless Flexider opted for an additional truck. (*Id.* at 12–13.)

_____

[3] By this time, Carol Cameron was no longer a Flexider employee. (Polk Dep. 23, Doc. No. 105-1, at 9.)

Polk testified that her initial understanding was that Flexider hired Airfreight to transport the equipment: "That's why we issued the contract to them." (Polk Dep. 57, Doc. No. 105-1, at 17.) At some point, however, she learned that Airfreight did not have its own trucks and was hiring "someone else to actually transport these parts," specifically TQL. (*Id.* at 57, 58, Doc. No. 105-1, at 17–18.) According to Polk, she believed TQL was the shipper; she did not learn until sometime after the first shipment in August that TQL was "sending trucks in to pick up equipment," based on "some sort of a subcontract or some other arrangement." (*Id.* at 59, Doc. No. 105-1, at 18.)

TQL, in fact, brokered the shipments to several different motor carriers, including Reds Trucking. Airfreight had no direct relationship, and no direct contact, with Reds Trucking. TQL had never used it before assigning it the Freight that is the subject of this lawsuit. (Prosise Dep. 24, Doc. No. 94-10, at 4.)

Throughout the logistics planning process, Flexider referred to the parts of the project by drawing numbers J17-4824-02, J17-4824-01A and 01B, and J17-4824-03A and 03B. Because the pieces of equipment were shipped separately on separate trucks, the highest value of any specific unit was just over $500,000. (*See* Doc. No. 94-17; Blignault Dep. 52, Doc. No. 105-3, at 16.) The purchase price for the equipment represented by drawing J17-4824-01 was $477,577. That piece of equipment was further split into two shipments: J17-4824-01A and J17-4824-01B. AmSty's purchase price for J17-4824-01A (the Freight) was $346,542.

While planning the shipping, Flexider repeatedly requested that Airfreight make sure there was adequate insurance in place to cover the cargo, up to the maximum value of the most expensive piece of equipment, or $500,000. (*See* Polk Dep. 61–62, Doc. No. 105-1, at 18–19.) On August 22, 2018, Bereziuk emailed Polk referencing the attached "insurance waiver that includes coverage for $500,000." (Doc. No. 94-17, at 1.) According to Bereziuk, the attachment to which he was referring was a document entitled "Waiver, Release, and Limitation of Liability to $500,000.00"

prepared by TQL ("Waiver"). (Bereziuk Dep. 118, Doc. No. 105-8, at 32; Doc. No. 94-17, at 23.) The Waiver contains blank spaces for identifying TQL's "Customer," and blank spaces for the customer representative's signature. The forms states in relevant part:

> Customer agrees TQL and its Carriers are not responsible or liable in any way for any loss or damage related to the transportation of cargo at the request, or on behalf of Customer in excess of $500,000.00 . . . . To this end, Customer releases and forever discharges TQL and its Carriers from any and all liability, including but not limited to a claim for subrogation, and waives any and all claims against TQL and its Carriers in excess of $500,000.00.

(Doc. No. 94-17, at 23.) There is no indication that Flexider signed the Waiver. Rather, it appears that the "Customer" to which the Waiver refers is Airfreight, since Airfreight, not Flexider, was in a contractual relationship with TQL.

Mark Prosise with TQL repeatedly told Bereziuk with Airfreight that TQL had adequate cargo insurance for $500,000 in case of a claim, to which Prosise referred as "spike insurance." (Prosise Dep. at 74–76, 78–80, Doc. No. 94-10, at 10–11.) TQL was aware of the value of the cargo and had all of the information it needed to buy adequate insurance, or to self-insure, for the value of the shipments. However, during his deposition, Prosise also conceded that he was mistaken when he told Bereziuk that TQL had "spike insurance," implying that it actually purchased a separate insurance policy to cover the value of Flexider's cargo. Instead, as he later learned, the company was self-insured:

> I didn't realize that they [TQL] had transitioned from spike insurance where you're paying it [to] an insurance company to do the coverage, and they explained to me that it didn't make sense, I guess, to pay a company, have premiums raised when you have claims. They are just . . . the insurance they [have] now, [is] like [a] self-insurance-type deal. That was what was explained to me.

(Prosise Dep. 75, Doc. No. 94-10, at 10.)

Jessica Case, a carrier services associate with TQL, testified that TQL carried cargo insurance coverage in the amount of $500,000. (Case Dep. 30, Doc. No. 105-5, at 10.) She also

testified, however, that the policy was not specific to the Flexider shipments; it was TQL's "overall annual policy for cargo insurance" that could be eroded over the course of the year if other claims were made against it. (*Id.* at 64, Doc. No. 105-5, at 18.) TQL typically avoided making claims against this policy, however, and never made a claim against the policy in connection with Flexider's claim for the damage to its Freight. (*Id.* at 31, Doc. No. 105-5, at 10.)

On August 17, 2018, Polk emailed Bereziuk, notifying him of a "firm pick up date" and directing him to "arrange for your contractor to be at our facility . . . on Tuesday, August 28" to load and ship the cargo identified as drawing J17-4824-02. (Doc. No. 94-17, at 2–3.) Drawing J17-4824-02 was delivered without incident to Flexider's customer on or about August 29, 2018. By this time, Polk knew that Airfreight was not moving the equipment itself and was arranging for the transport by third-party motor carriers, and she never objected to this arrangement.

Four more trucks arrived at Flexider to transport the remaining cargo on October 15 and 16, 2018. Two trucks left on October 15 and delivered the cargo they were transporting to Flexider's customer in Louisiana on October 16, without incident. A third truck left Flexider's facility in Oak Ridge, Tennessee at 9:20 a.m. on October 16, 2018 and arrived without incident at its destination. The fourth truck, owned and operated by Reds Trucking, carrying part J17-4824-01A, departed that same morning at 10:35 a.m. Approximately seventy miles from its destination, traveling on a road for which it did not have a travel permit, the Reds Trucking tractor-trailer carrying the Freight became lodged on railroad tracks and was struck by an oncoming train. (*See* Police Report, Doc. No. 105-6, at 6–7.) The Freight was destroyed and deemed a total loss; Flexider sold it as scrap to Southern Recycling for $7,518.

None of the bills of lading for the different shipments mentions Airfreight or TQL. (*See* Doc. Nos. 94-29, 94-30.) Flexider understood, at the time the shipment of the Freight took place, that Airfreight was acting as a broker rather than a carrier.

On December 18, 2018, Flexider, through its attorney, sent a claim to Airfreight, demanding payment in the amount of $329,243. Six months later, after learning that its damages included the cost incurred by AmSty to procure a replacement part from another manufacturer on a rush basis, Flexider sent demand letters to Reds Trucking, Airfreight, and TQL, claiming damages in the amount of $742,754.96. (*See* Doc. No. 44, at 29–37.) In a letter dated August 19, 2019, Jessica Case, as claims representative for TQL, sent a letter to Airfreight, denying liability and asserting that the carrier, Reds Trucking, alone was liable for the damage to the Freight. (Doc. No. 44, at 42.) Reds Trucking's insurer denied Flexider's claim as well. (*See* Doc. No. 105-18.) According to Flexider, all three defendants, including Reds Trucking, have denied its claim, and Airfreight specifically instructed Flexider not to reach out to Airfreight's insurer directly, telling Polk that the claim would be processed through Mark Prosise at TQL. (*See* Doc. No. 105-13, at 2.)

Flexider asserts that it is entitled to damages in the amount of $742,754.96, which was the total cost to replace the Freight. Flexider's customer, AmSty, bought a replacement for the Freight from a different manufacturer, Senior Flexonics, because Flexider had ceased manufacturing in October 2018. (Blignault Dep. 8, Doc. No. 105-3, at 5.) As a result, Flexider was unable to manufacture the replacement part itself. Flexider had never informed Airfreight that Flexider was ceasing business after finishing the project for AmSty.

According to Airfreight, there was no formal, written contract between Flexider and Airfreight; instead, Airfreight agreed to arrange for the transportation of the equipment in

exchange for compensation through a series of emails and telephone calls. (*See, e.g.*, Doc. No. 94-17 (series of emails between Bereziuk and Cameron and between Bereziuk and Polk).) Flexider denies this assertion, pointing to the Purchase Order it issued to Airfreight, dated August 7, 2018, for the freight charges in connection with the shipment of the equipment. This Purchase Order, which was actually issued to Riviera Finance as "vendor," apparently at Bereziuk's instruction (Bereziuk Dep. 48, Doc. No. 105-8, at 14), states on its face that it is "subject to Flexider USA standard terms and conditions." (Doc. No. 94-19.) There is no indication in the record regarding whether these "Terms and Conditions" were actually enclosed with the Purchase Order or as to whether Airfreight, as opposed to Rivera Finance, ever received a copy of the Purchase Order. In any event, Flexider's corporate representative testified that the Terms and Conditions referenced in the Purchase Order were "standard terms and conditions" that applied, not just to Flexider's agreements with its "transportation providers," but with "all [of] its providers." (Blignault Dep. 47, Doc. No. 105-3, at 15.)

In particular, the Terms and Conditions include a warranty, pursuant to which the "Seller" (defined as the "person or entity to whom this purchase order is directed") purportedly agreed that all goods "delivered" by it would be "free from any defects in workmanship and material and shall conform strictly to the specifications, drawings or samples specified or furnished." (Doc. No. 44, at 23.) The warranty states that, upon any breach of the warranty, the Buyer (Flexider), "in addition to all other remedies available" to it, had the option of requiring "prompt correction or replacement of the defective or nonconforming goods and or [sic] work or any part thereof" from the Seller. (*Id.*) In addition, the Terms and Conditions require the Seller to pay all costs and attorney's fees incurred by the Buyer "in enforcing any of the terms and conditions of this Purchase Order or on

account of Seller's breach or failure to perform any of the terms and conditions of this Purchase Order." (*Id.* at 24.)

**B.    Additional Facts Relevant to TQL's Motion**

TQL asserts that the only "contract" in existence between it and AirFreight is a Credit Application executed on August 27, 2011, pursuant to which TQL agreed to provide freight transportation broker services in return for Airfreight's agreeing to certain material terms and conditions, including but not limited to a mandatory forum selection clause. (*See* Boaz Dep. at 47–52, Doc. No. 108-2, at 14–15; *see also* 2011 Credit Application, Doc. No. 102-3, at 17–19.[4]) Boaz, who is an owner and officer of Airfreight (Boaz Dep. at 11, Doc. No. 108-2, at 4), testified that it was "pretty standard in the industry" for a broker to require a credit application and for the credit application to incorporate terms and conditions (*id.* at 45, Doc. No. 108-2, at 13). He acknowledged his signature on the 2011 Credit Application and agreed that he would have signed it when Airfreight and TQL began doing business together. At the time, on the Credit Application, he indicated that the maximum load value for shipments Airfreight made through TQL would be "51K to 100K." (*Id.* at 48; Doc. No. 108-2, at 14.) He also acknowledged that the Credit Application was accompanied by terms and conditions that would generally govern the parties' relationship. (*Id.*) He also stated, however, that Mark Prosise, TQL's usual point person with Airfreight and specifically its contact for the job for Flexider, "does a lot of stuff verbally, and he always has." (*Id.*) Regarding the Flexider job, for example, Prosise had been notified "over and over" that additional insurance was needed, and he specifically represented that TQL had obtained "spike insurance" for this job. (*Id.* at 48–49, Doc. No. 108-2, at 14.)

---

[4] The first page of this exhibit, Doc. No. 102-3, at 17, is unreadable.

Otherwise, however, the terms and conditions accompanying the Credit Application delineated payment terms between TQL and "Applicant" and stated, as relevant to the allocation of liability for damage to cargo:

> 10. Applicant understands motor carriers under contract with [TQL] are required to maintain cargo loss and damage liability insurance in the amount of $100,000 per shipment. Please sign below acknowledging that loads valued in excess of $100,000 will not be tendered without giving written notification to allow [TQL] and the contracted carrier the opportunity to arrange for increased insurance limits. Failure to provide written notice will result in your loads not being insured to the extent the value exceeds $100,000.00.

> 11. The state courts located in Clermont County, Ohio shall have exclusive and irrevocable jurisdiction and shall be the exclusive venue with respect to any claim, counterclaim, or dispute arising in connection with any transactions, loads, or other business between [TQL] and applicant.

> . . . .

> 7. Your freight will be insured by the carrier at the default amount for your commodity and class . . . , but your freight may not be insured for its full value. You may purchase cargo insurance on the full value of your freight through TQL at a rate of $.50 per $100 value; minimum charge of $30 will apply.

(Doc. No. 102-3, at 18.)

Boaz agreed that he had no "reason to believe" that the 2011 Credit Application was not still in effect in 2018 and covered the Flexider shipments. (Boaz Dep. 52, Doc. No. 108-2, at 15.)

TQL maintains that it had "appropriate insurance coverage in an amount exceeding the contract price of the damaged Freight" (Doc. No. 101 ¶ 8), citing the deposition testimony of Jessica Case. As set forth above, Case, indeed, testified that TQL had $500,000 in "cargo insurance," but she also made it clear that the policy was not specific to the Flexider shipments. Instead, it was TQL's "overall annual policy for cargo insurance" that could be eroded over the course of the year if other claims were made against it. (*Id.* at 64, Doc. No. 105-5, at 18.) Otherwise, TQL was self-insured. If the broker on a project checks a box (or "populates a field" on the computer program) indicating the value of the cargo is in excess of $100,000, that "triggers a $55

high-value cargo fee," which is deducted from the broker's commission and paid into a separate fund, from which, if TQL "decide[s], as a company, to pay on a claim, [it] dip[s] into that pool." (*Id.* at 88–89, Doc. No. 105-5, at 24; *see also* Prosise Dep. 72–73, Doc. No. 105-12, at 20 (confirming that he told Bereziuk that TQL had "spike insurance" but that he was wrong: "We didn't have spike insurance. We were self-insured.").) Upon receiving Flexider's claim, TQL never filed a claim with its insurance company, and it denied the claim. (Case Dep. 30–31, Doc. No. 105-5, at 10.)

### C.    Procedural History

The plaintiff filed its original Complaint in August 2019 and, in response to an initial round of motions to dismiss, filed the Amended Complaint in November 2019 (Doc. No. 44), asserting claims against Reds Trucking under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 (the "Carmack Amendment"), which governs claims concerning goods lost or damaged by a motor carrier during the interstate shipment of goods (Count I); claims against Airfreight under the Carmack Amendment (Count II) and, in the alternative, for breach of contract (Count III), unjust enrichment (Count V), and negligence (Count VII); and claims against TQL for breach of contract based on a theory that Flexider was a third-party beneficiary of a contract between TQL and Airfreight (Count IV) and, alternatively, unjust enrichment (Count VI) and negligence (Count VII).

In March 2020, the court entered an Order granting Airfreight's motion for dismissal of all claims against it *except* the Carmack Amendment claim and the common-law breach of contract claim. (Doc. Nos. 66, 67.) At the time, the court noted that, if discovery established that Airfreight was a broker, then all claims against it other than the breach of contract claim would be preempted by 49 U.S.C. § 14501(c)(1), a provision of the Federal Aviation Administrative Authorization Act of 1994 ("FAAAA"). If, instead, as the plaintiff alleged in the Amended Complaint, Airfreight

functioned as a motor carrier under the statute, then all claims other than those authorized by the Carmack Amendment would be preempted, including the breach of contract claim. (*See* Doc. No. 66, at 21.) Similarly, the court dismissed the state-law tort claims asserted against TQL, leaving intact Flexider's breach of contract claim against it, based on a third-party-beneficiary theory of recovery. (*Id.* at 20.)

Following discovery, Airfreight and TQL filed their Motions for Summary Judgment on January 15, 2021 and January 28, 2021, respectively, along with supporting Memoranda of Law and Statements of Undisputed Material Facts. (Doc. Nos. 92, 93, 94, 99, 100, 101.) The plaintiff has responded to both motions and Statements of Fact and submitted its own Statements of Additional Facts (which largely consist of argument rather than fact) (Doc. Nos. 103, 104, 106, 107), and both defendants filed Reply briefs and Responses to the Statements of Additional Facts (Doc. Nos. 109–112). As indicated above, all parties have submitted substantial evidentiary material, and the facts are basically undisputed. The interpretation of the facts is disputed, however.

## III.   DISCUSSION

### A.   Airfreight's Motion

First, Airfreight seeks dismissal of the Carmack Amendment claim against it on the basis that the undisputed facts now establish that it acted as a broker and not as a motor carrier with respect to the shipment at issue. The plaintiff agrees and expressly concedes that dismissal of the Carmack Amendment claim against Airfreight is appropriate. The court, therefore, will grant that aspect of Airfreight's motion and dismiss the Carmack Amendment claim without further discussion.

Airfreight also seeks summary judgment on the breach of contract claim against it, asserting that there is no genuine issue of material fact as to whether Airfreight fulfilled its contractual obligations to Flexider. In the alternative, it seeks partial summary judgment limiting

its liability to $346,542, arguing that the damages the plaintiff seeks—calculated based on the cost of the replacement part from a competitor—are not a normal and foreseeable result of the alleged breach.

### 1. Breach of Contract

Airfreight's argument for dismissal of the contract claim against it goes like this: there is no formal written agreement between the parties. Instead, the parties agreed, through an exchange of emails and telephone calls, that Airfreight would arrange for the transportation of Flexider's equipment, including the Freight, from Tennessee to Louisiana. Airfreight maintains that it fulfilled its contractual obligations to Flexider when it engaged TQL to select the motor carriers, and TQL actually found those motor carriers. It is this portion of the parties' agreement that Flexider maintains is governed by the Terms and Conditions purportedly accompanying its Purchase Order.

Airfreight also agrees that part of its obligation was to make sure insurance was in place "covering the value of the freight." (Doc. No. 93, at 15.) Airfreight acknowledges that Flexider made very clear, in negotiating the transportation of the equipment, that Flexider required, as part of the deal, that Airfreight put in place adequate insurance. (Doc. No. 94 ¶ 37.) Airfreight maintains that it "gave TQL all the information needed for TQL to procure adequate insurance for the cargo or to self-insure for the gap between the amount of Red's Trucking's insurance and the stated value of the cargo." (*Id.* ¶ 40.) It further maintains that TQL actually had sufficient insurance in place, based on the cargo policy issued to TQL by Old Republic in the amount of $500,000. (*Id.* ¶ 42.) Thus, Airfreight maintains, it fulfilled any obligation to ensure that the cargo was adequately insured. (Doc. No. 93, at 15.) In response, the plaintiff maintains that Airfreight's obligation to obtain adequate insurance coverage was a non-delegable duty and, moreover, that there is a

material factual dispute as to whether TQL obtained adequate insurance to cover the value of the Freight.

Although the plaintiff relies on the Terms and Conditions referenced in its Purchase Order to support its argument that Airfreight's obligations under the parties' agreement were non-delegable, the court does not find it necessary to resort to the Terms and Conditions to address this particular issue. Under Tennessee law, a party who contracts to perform services generally may delegate performance of the contract, in whole or in part, to a third party, but such delegation "does not relieve the contractor from the duties implicit in the original contract." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 295 (Tenn. 2011) (citing Restatement (2d) of Contracts § 318(1)). In this case, it is undisputed, at least for purposes of Airfreight's Motion for Summary Judgment, that Airfreight undertook an obligation to ascertain that that adequate insurance was in place to cover the value of the Freight, and, as Flexider points out, Airfreight does not point to any evidence that Flexider consented to the delegation of that obligation to TQL.

Moreover, also for purposes of Airfreight's motion, there is a genuine dispute as to whether TQL in fact had insurance coverage specifically for the purpose of covering the Freight. Airfreight employee Bryan Bereziuk testified that TQL employee Mark Prosise assured him that TQL had $500,000.00 of insurance to cover the Freight, referring to it as "spike insurance." (Bereziuk Dep. 104, Doc. No. 105-8, at 28; *see also* Boaz Dep. 48–49, 68, Doc. No. 108-2, at 14, 19.) For his part, Prosise admitted that he told Bereziuk as much and that it was his understanding, at the time they reached an agreement, that, by populating the field for high-cargo insurance, such insurance was automatically put in place. In his deposition, however, Prosise admitted that he made a mistake and that TQL did not have any "spike insurance" but instead was "self-insured." (Prosise Dep. 73, Doc. No. 105-12, at 20.)

In addition, Jessica Case clarified that, while TQL had $500,000 in cargo insurance, this was not a policy to cover Flexider's Freight. Instead, it was an "overall annual policy for cargo insurance" subject to eroding by other claims. (Case Dep. 63–64, Doc. No. 105-5, at 18.) Case also confirmed that TQL neither filed a claim nor investigated whether any insurance policy was applicable to the plaintiff's claim. Instead, TQL denied the claim based on its finding that there was "absolutely no connection between any act or omission on the part of TQL and the alleged cargo claim." (Doc. No. 44, at 42.) TQL's denial of the claim as not covered begs the question of whether it, in fact, had insurance coverage for damage to the Freight while it was in transit.

In its Reply, Airfreight also argues that it fulfilled its obligation to obtain insurance for the Freight, as established by its provision of a certificate of insurance for the exact amount of insurance requested, $502,230. (Doc. No. 109, at 4.) Further, it asserts that "[a]ny issue about whether the insurance will ultimately cover the claim is not ripe, because there is no judgment to which the insurance must respond." (*Id.*) This argument borders on the absurd. First, an obligation to provide insurance coverage under an insurance policy is not contingent upon a judgment. Litigation is a last-resort means of enforcing an insurance company's coverage obligation under an existing policy. Second, Dan Boaz testified that he submitted a claim to his insurance company but he had "no idea" whether it had responded or what its response might have been (Boaz Dep. 26, Doc. No. 108-2, at 10.) If Airfreight had provided insurance coverage for damage to Flexider's Freight, then insurance proceeds to cover that value, at a minimum, should have been forthcoming following a demand made upon the insurer. Airfreight, in sum, is not entitled to summary judgment on liability.

The plaintiff also opposes Airfreight's motion on the basis that its agreement with Airfreight is governed by the Terms and Conditions attached to Flexider's Purchase Order. It

contends that Airfreight is in breach of the condition that it deliver the Freight in good condition and "free from defects." (Doc. No. 103, at 16 (citing Terms and Conditions, Doc. No. 44, at 23).) The plaintiff, however, has not moved for summary judgment, and the court finds that resolution of Airfreight's Motion for Summary Judgment as to liability on its obligation to obtain insurance coverage does not require addressing this question.

2.    *Limitation of Airfreight's Liability*

Based on the Terms and Conditions, Flexider seeks damages of at least $742,755, plus attorney's fees and costs. (*See* Doc. No. 44, at 15.) $742,755 is the amount Flexider's customer had to spend—and thus apparently was able to recover as breach of contract damages from Flexider (by offsetting the amounts it otherwise owed to Flexider)—to obtain a replacement part for the Freight.

In the alternative to summary judgment on the issue of liability, Airfreight moves for a judgment limiting its liability. It argues that Flexider's damages are limited to those permitted by the Carmack Amendment and, alternatively, that Flexider is not entitled to recover breach of contract damages in excess of the value of the Freight, or $346,542. In the portion of its Memorandum addressing breach of contract damages, Airfreight argues only that Flexider is limited to recovering the "normal and foreseeable" damages and that the cost of obtaining the replacement part from Flexider's competitor was not foreseeable at the time the parties contracted for the transportation of the Freight. (Doc. No. 93, at 19.)

In its Response, Flexider insists both that the Terms and Conditions obligate Airfreight to cover the cost of replacing the destroyed part and that this cost is a reasonable and foreseeable measure of contract damages under the circumstances of this case. Because the amount of damages is "essentially a fact question," Flexider asserts that summary judgment should be denied on this issue as well. In addition, Flexider posits that it is entitled to recover attorney's fees based on its

standard Terms and Conditions, which, it claims, govern its contractual relationship with Airfreight. In its Reply, Airfreight argues, for the first time, that the Terms and Conditions "are not part of the contract between Airfreight and Flexider" (Doc. No. 109, at 1).

a)     *Whether Damages Are Limited by the Carmack Amendment*

Because Flexider concedes that Airfreight is not a carrier and that the Carmack Amendment does not apply, Airfreight's argument that Flexider's damages are circumscribed by the Carmack Amendment has effectively been rendered moot. Airfreight supplies no support for its contention that breach of contract damages would be limited to those that Reds Trucking would be required to pay under the Carmack Amendment, so the court rejects that contention. The damages recoverable against Airfreight will be those attributable to the alleged breach of contract, not violation of the Carmack Amendment.

b)     *Whether Flexider's Terms and Conditions Govern the Agreement to Transport the Freight*

Resolution of Airfreight's motion is complicated by the fact that the parties disagree fundamentally as to the terms of their agreement. It is undisputed for purposes of Airfreight's motion that Airfreight shouldered two separate burdens: (1) an obligation to arrange for the transportation of the equipment, including the Freight; and (2) an obligation to arrange for adequate insurance coverage in the event of damage to the equipment, including the Freight. Regarding the first obligation, however, Flexider maintains that Airfreight's obligation to arrange for the transportation of the Freight is covered by its Terms and Conditions, pursuant to which Airfreight did not simply agree to arrange for the transportation of the equipment. Rather, it effectively guaranteed its delivery "without defect," agreed that damages for breach of that obligation entitled Flexider to demand that Airfreight cover the cost of replacing any part damaged in transit, and agreed to pay attorney's fees incurred by Flexider in enforcing this obligation. Airfreight clearly

denies that its agreement with Flexider is subject to the Terms and Conditions, but, unfortunately, it did not move for summary judgment on this question.

In fact, the defendant did not address the applicability of the Terms and Conditions until it filed its Reply. "Generally speaking, arguments raised for the first time in reply briefs are waived, and this applies both on appeal and to summary judgment motions filed in the trial court." *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019) (citing *Am. Family Prepaid Legal Corp. v. Columbus Bar Ass'n*, 498 F.3d 328, 335 (6th Cir. 2007); *Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008)). The Sixth Circuit has explained the rationale for this rule as follows:

> Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived.

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (citation omitted). At the same time, the Sixth Circuit also recognizes that a defendant is generally entitled to address new arguments raised for the first time in a plaintiff's response. *Matthews v. Wells Fargo Bank*, 536 F. App'x 577, 579 (6th Cir. 2013); *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476 (6th Cir.2002) (explaining that, where a non-movant made factual allegations in her response to a motion for summary judgment that the movant had not previously had an opportunity to address, those allegations "warrant[] a reply brief and supporting affidavits that would not have been filed with the original summary judgment brief").

The court finds that the defendant's argument regarding the Terms and Conditions—specifically including the attorney's fee-shifting provision in the Terms and Conditions—is waived by its failure to wait until its Reply to address this issue. To be clear, Airfreight references attorney's fees in passing in its opening Memorandum, but only in the course of addressing the

damages that would be available if the Carmack Amendment applied to Flexider's claims against it. In that context, Airfreight argued that the Carmack Amendment does not authorize the recovery of attorney's fees and that the Carmack Amendment, if it applied, would preempt the plaintiff's contract-based claim for attorney's fees. Since the plaintiff concedes that the Carmack Amendment does not apply, Airfreight's argument in that regard was rendered moot. Airfreight does not actually address the plaintiff's contention that the Terms and Conditions authorize it to recover the cost of replacing the damaged part. Instead, Airfreight argues that ordinary breach of contract principles limit Flexider's damages to those that were the normal and foreseeable result of the breach of contract—that is, the contract to arrange for transportation.

Airfreight was made aware no later than the filing of the Amended Complaint that the plaintiff's position is that the Terms and Conditions incorporated into its Purchase Order govern the parties' relationship, but it affirmatively chose not to address that contention in its Motion for Summary Judgment and initial Memorandum. Thus, its Reply to the plaintiff's Response does not simply "elaborate on arguments made in [its] original motion." *Asbury v. Teodosio*, 412 F. App'x 786, 792 (6th Cir. 2011). It raises various arguments as to why the Terms and Conditions cannot be the "governing contract" between the parties, but it did not move for summary judgment on this question, and the plaintiff has not had the opportunity to address Airfreight's arguments regarding whether a meeting of the minds in mutual assent occurred, as required by Tennessee law of contract formation. *See, e.g.. Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001). Moreover, the evidence uncovered in discovery and supplied to the court by both parties does not anywhere address the question of mutual assent to the Terms and Conditions (or lack thereof). Under these circumstances, the court finds that Airfreight has waived, for purposes of its Motion for Summary Judgment, consideration of the question of whether Flexider's Terms and Conditions

govern the parties' contractual relationship. The court, therefore, is not in a position to address whether Flexider can recover the replacement cost of the Freight or the attorney's fees incurred in bringing this suit.

### 3. Limitation of Airfreight's Liability for Breach of Contract to Procure Adequate Insurance

Regarding damages related solely to breach of Airfreight's obligation to procure adequate insurance, Airfreight points out that Flexider's initial demand, sent on December 18, 2018, was for the value of the Freight (*see* Doc. No. 104 ¶ 33) and that Flexider had stressed all along only that its cargo "needed to be insured at its full value." (Doc. No. 93, at 19.) Airfreight argues that the replacement part was manufactured by Flexider's competitor at double the cost only because Flexider ceased manufacturing immediately after producing the equipment at issue in this case. In addition, Airfreight asserts that, while Flexider knew that it was shutting down operations after manufacturing the equipment for the customer in Louisiana, Airfreight was not apprised of that fact. Thus, Airfreight argues, "[t]he doubling of the value of the Freight is not a 'normal and foreseeable result' of the purported breach of contract by Airfreight," and "Flexider cannot recover damages in excess of the value of the Freight, which was $346,542.00," minus the salvage value Flexider received for it. (Doc. No. 83, at 19 & n.6.)

As set forth above, the alleged breach regarding which Airfreight has moved for, and been denied, summary judgment is its breach of the obligation to obtain insurance coverage. Under Tennessee law, the amount of damages to be awarded in a particular case is essentially a fact question, but the choice of the proper measure of damages is a question of law to be decided by the court. *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005) (citations omitted). "The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed."

*Id.* (citation omitted); *see also Hawkins v. Reynolds*, 467 S.W.2d 791, 795 (Tenn. Ct. App. 1971) ("The measure of damages for breach of any contract is that which was reasonably contemplated by the parties."). The plaintiff claiming breach of contract has the burden of proving the damages caused by the breach. *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006).

Generally, "foreseeability is the touchstone of contract damages" in Tennessee. *Metro. Gov't v. State St. Bank & Tr. Co.*, 187 F. App'x 511, 514 (6th Cir. 2006). Tennessee courts permit the recovery of damages that are the "normal and foreseeable result of a breach of contract." *Morrow v. Jones*, 165 S.W.3d 254, 259 (Tenn. Ct. App. 2004) (quoting *Wilson v. Dealy*, 434 S.W.2d 835, 838 (Tenn. 1968)). Damages are a foreseeable result of a breach if they "may be reasonably supposed to have entered into the contemplation of the parties." *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001) (quoting *Simmons v. O'Charley's, Inc.*, 914 S.W.2d 895, 903 (Tenn. Ct. App. 1995)). Conversely, damages are too remote if they "could not have been contemplated by the parties as the natural result of any breach of the contract." *Hennessee v. Wood Grp. Enter., Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991); *see also Baker v. Riverside Church of God*, 453 S.W.2d 801, 809 (Tenn. Ct. App. 1970) ("[D]amages which do not arise naturally from a breach of the contract, or which are not within the reasonable contemplation of the parties, are not recoverable. "). In short, damages are not recoverable unless they reasonably should have been "contemplated by the parties as being at the heart of the contract." *St. Clair v. Local Union No. 515 of Int'l Bhd. of Teamsters*, 422 F.2d 128, 132 (6th Cir. 1969) (applying Tennessee law).

Based on this law alone, it seems clear that Airfreight, which did not know that Flexider would be ceasing manufacturing operations immediately after completing its work for AmSty,

could not reasonably have anticipated that the cost of procuring a replacement part would be double the original cost of the part. Moreover, in the context of claims against insurance brokers for breach of a contract to obtain insurance coverage for a client, courts widely agree that the appropriate measure of damages is "the amount the insurer would have paid on behalf of the insured had the desired coverage been obtained." *O'Daniel v. Stroud NA*, 604 F. Supp. 2d 1260, 1262 (D.S.D. 2008) (citation omitted) (applying South Dakota Law); *accord, e.g.*, *J. Smith Lanier & Co. v. Se. Forge, Inc.*, 630 S.E.2d 404, 405 (Ga. 2006); *Capital Site Mgmt. Associates v. Inland Underwriters Ins. Agency, Ltd.*, 806 N.E.2d 959, 964 (Mass. App. Ct. 2004); *Lake Cty. Grading Co. of Libertyville, Inc. v. Great Lakes Agency, Inc.*, 589 N.E.2d 1128, 1131 (Ill. App. Ct. 1992); *Action Ads, Inc. v. Judes*, 671 P.2d 309, 312 (Wyo. 1983) (referring to this measure of damages as a "well known rule").

Although Airfreight was not an insurance broker, it was a broker, and there is no dispute, at least for purposes of Airfreight's Motion for Summary Judgment, that Airfreight incurred a contractual obligation to obtain insurance coverage on behalf of Flexider. In this context, too, the court finds that the appropriate measure of damages for its alleged breach of that contract is the "amount the insurer would have paid . . . had the desired coverage been obtained." *O'Daniel*, 604 F. Supp. 2d at 1262. In addition, it appears to be undisputed, at least for purposes of Airfreight's motion, that the plaintiff requested insurance coverage in the amount of $500,000 for each shipment, not merely insurance in the amount of the maximum value of each individual shipment. If Airfreight breached that contract, then its damages potentially would not be limited to the value of the particular Freight that was damaged but, instead, to the maximum amount of the insurance coverage for the shipment, or $500,000. The parties have not provided information regarding what the precise terms of any such insurance policy would have been, so there remains a question of

fact as to whether Flexider would have been able to recover all of its losses incurred in connection with the destruction of the Freight, up to the maximum coverage of $500,000.

The court, therefore, will deny Airfreight's motion insofar as it seeks to limit its liability for breach of its obligation to obtain insurance coverage to the declared value of the Freight, or $346,542. Rather, Airfreight's maximum liability for breach of the contract to procure $500,000 in insurance coverage is $500,000. This conclusion, however, is premised solely upon the contract to procure insurance, without reference to whether Airfreight's obligation to arrange for transportation of the Freight was subject to Flexider's Terms and Conditions.

### B.    TQL's Motion

The basis for Flexider's claim against TQL is that Flexider is the third-party beneficiary of an agreement between Airfreight and TQL, pursuant to which TQL hired carriers to transport Flexider's equipment and agreed to procure insurance in the amount of $500,000 to cover the value of the Freight. TQL moves for summary judgment on the grounds that the only contract in existence between it and Airfreight is a 2011 Credit Application, that it did not breach the Credit Application, and, in any event, that Flexider is not a third-party beneficiary of that agreement. In making this argument, TQL concedes that Mark Prosise was incorrect in representing that TQL put in place spike insurance to cover Flexider's cargo, but, it claims, TQL did have in place a $500,000 cargo policy in addition to a self-insurance reserve pool, which satisfied any obligation that it maintain adequate insurance. Further, it argues that "Flexider's actual contention with TQL is *not* that TQL did not have appropriate insurance coverage; instead, Flexider takes issue with the fact that TQL declined to pay its claim for cargo loss after investigating the matter and determining that Flexider's claim was invalid." (Doc. No. 100, at 12.) It maintains that, if there was any contractual obligation in place, it was to provide *insurance*, not to guarantee *coverage*. And, it

insists, because it had adequate insurance, "Flexider cannot show that TQL breached any of its contractual obligations." (*Id.*)

As the plaintiff argues, regardless of whether the Credit Application might otherwise apply to transactions between Airfreight and TQL, there is ample evidence in the record from which a jury could conclude that Mark Prosise, as TQL's apparent agent, entered into a verbal agreement with Airfreight, acting through Bryan Bereziuk, to arrange for the transportation of Flexider's equipment from Oak Ridge, Tennessee to St. James, Louisiana and, more to the point, to procure sufficient insurance for the freight, specifically in the amount of $500,000. Mark Prosise's own testimony appears to establish that fact. However, besides not obtaining spike insurance itself, TQL also failed to ascertain that Reds Trucking had sufficient carrier insurance in place to cover the value of the equipment, despite knowledge of the amount of insurance that Airfreight sought— and paid for—on behalf of Flexider.[5]

In that regard, Dan Boaz testified that Airfreight "paid for this insurance with TQL" and that TQL assured Airfreight that it would provide sufficient cargo insurance to cover the Freight in the event of damage. (Boaz Dep. 25:24-25, 26:1-22.) Bereziuk corroborated this account (Bereziuk Dep. 52), and so did Mark Prosise. (Prosise Dep. 78:15-80:6.) After the train accident, Boaz confirmed with Prosise that requisite insurance was in place. (Boaz Dep. 24–25.) In other words, there is at least a question of fact as to whether an oral agreement for the procurement of insurance was formed between TQL and Airfreight, separate and apart from the Credit Application.

---

[5] In addition, Prosise supplied to Bereziuk the "Waiver, Release, and Limitation of Liability to $500,000.00," pursuant to which "Customer" (Airfreight) agreed that TQL and its carriers would not be liable for any loss or damage in excess of $500,000. (Doc. No. 94-17, at 23.) This Waiver also corroborated Prosise's representation that TQL had insured the Freight for $500,000, or, at a minimum, required the carrier to maintain insurance coverage of $500,000 for the Freight.

There is also a question of fact as to whether TQL breached that agreement. It claims that the $500,000 cargo policy and a self-insurance reserve pool satisfied any obligation that it maintain adequate insurance and that Flexider's real dispute is with the fact that TQL denied coverage for Flexider's claimed loss. To be clear, TQL denied coverage for the entire loss, even up to the declared value of the Freight and not merely for the amount in excess of that value. If, in fact, TQL had insurance coverage for damage to the Freight, then it would not have been in a position to deny coverage for that loss. In other words, its denial of *coverage* calls into question whether it had in place *insurance* for the type of loss for which insurance was sought in the first place.

The next question is whether Flexider can bring suit against TQL based on its alleged breach of the contract between TQL and Airfreight. Under Tennessee law, a third party may enforce a contract if it is the intended beneficiary of that contract. *SPE GO Holdings, Inc. v. W & O Constr., Inc.*, 759 F. App'x 359, 3655 (6th Cir. 2018) (citing *Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001)). To maintain an action as a beneficiary, the third party must show: "(1) a valid contract made upon sufficient consideration between the principal parties and (2) the clear intent to have the contract operate for the benefit of a third party." *Concord EFS*, 59 S.W.3d at 68–69 (citations omitted). The Tennessee Supreme Court has stressed that the "primary focus is upon the intent of the contracting parties." *Id.* at 70. A party is an intended beneficiary if:

> (1) The parties to the contract have not otherwise agreed;
>
> (2) Recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties; and
>
> (3) The terms of the contract or the circumstances surrounding performance indicate that either:
>
>> (a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or

(b) the promisee intends to give the beneficiary the benefit of the promised performance.

*Id.*

In this case, with regard to the agreement to obtain $500,000 in insurance, (1) there is no indication that Airfreight and TQL "otherwise agreed"; (2) allowing Flexider to enforce the right appears appropriate in order to effectuate the parties' intention; and (3) the circumstances surrounding the terms of the contract indicate that the performance of the promise—TQL's promise to procure insurance that would cover damage to Flexider's Freight up to the amount of $500,000—would both discharge a duty owed by the promisee (Airfreight) to the beneficiary (Flexider) (that is, Airfreight's non-delegable duty to Flexider to procure $500,000 in insurance coverage for the Freight) and, if TQL had procured insurance and paid out a claim under such insurance to Airfreight, Airfreight as promisee intended to pass the benefit of such payment to Flexider. In short, Flexider was clearly the third-party beneficiary of the agreement between Airfreight and TQL to insure the freight up to $500,000, and TQL is not entitled to summary judgment as to liability on Flexider's breach of contract claim against it.

In the alternative, TQL, like Airfreight, seeks partial summary judgment limiting its liability to $346,542, the declared value of the Freight. For the same reasons as those set forth above in connection with Airfreight's motion, the court finds that TQL is not entitled to a judgment limiting its liability to the declared value of the Freight. However, it is entitled to partial summary judgment limiting its liability to $500,000, the maximum value of the insurance it apparently agreed to provide.[6] *Accord O'Daniel*, 604 F. Supp. 2d at 1262.

---

[6] Flexider, of course, does not claim that its Terms and Conditions govern the agreement between Airfreight and TQL.

**IV.     CONCLUSION**

For the reasons set forth herein, Airfreight's Motion for Summary Judgment will be granted in part and denied in part. Insofar as it seeks dismissal of the Carmack Amendment claim against it, the motion will be granted. In all other respects, the motion will be denied. The court does not reach the question of whether Flexider's Terms and Conditions govern the parties' relationship.

TQL's Motion for Summary Judgment will also be granted in part and denied in part. Its motion for judgment as to liability will be denied. Its motion for a judgment limiting its liability to $346,542 will also be denied, but the court will grant partial summary judgment finding that its liability will be limited to the maximum amount of the insurance coverage it agreed to provide, or $500,000.

An appropriate Order is filed herewith, and this matter remains scheduled for a jury trial to begin on June 29, 2021.

_____
ALETA A. TRAUGER
United States District Judge